## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| **HARRISON COUNTY MISSISSIPPI,** | ) | |
| **HANCOCK COUNTY, MISSISSIPPI,** | ) | |
| **CITY OF BILOXI MISSISSIPPI,** | ) | |
| **CITY OF D'IBERVILLE, MISSISSIPPI,** | ) | |
| **CITY OF WAVELAND, MISSISSIPPI,** | ) | Case No.:  1:19-cv-986-LG-RHW |
| **CITY OF PASS CHRISTIAN, MISSISSIPPI,** | ) | |
| **CITY OF DIAMONDHEAD, MISSISSIPPI,** | ) | |
| **MISSISSIPPI HOTEL AND LODGING** | ) | |
| **ASSOCIATION, and MISSISSIPPI** | ) | |
| **COMMERCIAL FISHERIES UNITED, INC.** | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **MISSISSIPPI RIVER COMMISSION and** | ) | |
| **U.S. ARMY CORPS OF ENGINEERS** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................................ 1

II.  JURISDICTION AND VENUE ARE PROPER IN THIS DISTRICT BECAUSE THE
DAMAGE FROM THE BONNET CARRÉ SPILLWAY OPENING OCCURRED IN THIS
DISTRICT.......................................................................................................................... 3

III.  THE PLAINTIFFS IN THIS CASE ARE LOCAL GOVERNMENTS AND BUSINESS
OWNERS WHO HAVE BEEN DIRECTLY DAMAGED BY THE OPERATION OF THE
BONNET CARRÉ SPILLWAY............................................................................................ 4

IV.  THE DEFENDANTS ARE THE AGENCIES RESPONSIBLE FOR OPERATING THE
BONNET CARRÉ SPILLWAY............................................................................................ 7

V.  THE BONNET CARRÉ SPILLWAY IS A PART OF THE MISSISSIPPI RIVER AND
TRIBUTARIES PROJECT, WHICH IS STILL UNDER CONSTRUCTION, AND IS
OPERATED AS AN INTEGRAL PART OF THAT PROJECT................................................. 7

VI.  THE BONNET CARRÉ SPILLWAY IS BEING OPENED MORE FREQUENTLY, AND
DAMAGE TO COASTAL MISSISSIPPI IS LIKELY TO CONTINUE TO OCCUR ON A
REGULAR BASIS. .......................................................................................................... 13

VII.  THE 2019 OPENINGS OF THE BONNET CARRÉ SPILLWAY CAUSED
WIDESPREAD DAMAGE TO THE NATURAL RESOURCES AND ECONOMY OF
COASTAL MISSISSIPPI. ................................................................................................. 14

VIII.  FEDERAL LAW REQUIRES THE CORPS TO TAKE ACTIONS TO ASSESS THE
IMPACTS OF OPENING THE BONNET CARRÉ SPILLWAY, AND TO CONSIDER
ALTERNATIVES THAT WOULD LESSEN OR PREVENT DAMAGE TO NATURAL
RESOURCES AND LOCAL COMMUNITIES. ...................................................................... 16

    A.    The National Environmental Policy Act Requires an Analysis of Impacts for Federal
Actions Like the Bonnet Carré Spillway. ............................................................................. 16

    B.    The Magnuson-Stevens Fishery Conservation and Management Act Requires
Consideration of the Impacts on Essential Fish Habitat of Actions Like Opening the Bonnet
Carré Spillway. ................................................................................................................... 19

IX.  FIRST CAUSE OF ACTION:  THE CORPS AND THE MISSISSIPPI RIVER
COMMISSION HAVE VIOLATED THE NATIONAL ENVIRONMENTAL
POLICY ACT .................................................................................................................. 20

X.  SECOND CAUSE OF ACTION:  THE CORPS AND THE MISSISSIPPI RIVER
COMMISSION HAVE NEVER CONSULTED ON IMPACTS TO ESSENTIAL FISH
HABITATS BEFORE OPERATING THE BONNET CARRÉ SPILLWAY. ........................... 22

XI.  PRAYER FOR RELIEF ......................................................................................................... 23

This First Amended Complaint is filed as a matter of course prior to the filing of any responsive pleading, pursuant to the provisions of F.R.C.P. 15(a).

## I.  INTRODUCTION

1.      In the spring and summer of 2019, the U.S. Army Corps of Engineers [sometimes hereafter Corps] and the Mississippi River Commission opened the Bonnet Carré Spillway element of the Mississippi River and Tributaries project, releasing a flood of polluted Mississippi River water through the Lake Pontchartrain Basin and into the Mississippi Sound, wreaking havoc on the natural resources, communities and businesses on the Mississippi Gulf Coast.

2.      Virtually all of the oyster reefs in the western Mississippi sound were wiped out. Shrimp and fish were driven out of seasonal habitats.  Bottom dwelling sea life was affected in hundreds of square miles of water bottoms, including commercially valuable species such as crab.  Bottle nose dolphin and endangered sea turtle corpses washed ashore in numbers not seen since the BP oil spill of 2010. These impacts hit fishermen hard, but also spread throughout the businesses dependent on the seafood industry.

3.      The polluted river water released through the Bonne Carré spillway is laden with nitrate and phosphorus.  The primary source of these pollutants is the virtually unregulated runoff of fertilizers and manure in the upper Mississippi River Basin.  These toxic nutrients caused a proliferation of algae blooms, some producing neurotoxins, throughout the area. Contact with Gulf waters all along the Mississippi Coast was prohibited for months at a time. Beaches closed and families abandoned their summer vacations, causing tourism related businesses to loose revenue.  Local governments lost tax revenues and incurred uncompensated expenses as a result.

1

4.      The economic damage to coastal fishing communities, local governments, and tourism- related businesses is still not fully known, but the Mississippi Department of Marine Resources has estimated the financial impacts to fisheries alone as over $200,000,000. In September 2019 the United States Department of Commerce granted Governor Phil Bryant's petition for a fisheries disaster declaration. The long-term impacts on Mississippi's coastal resources are not fully known but will likely cost hundreds of millions more.

5.      The disastrous Bonnet Carré opening of 2019 is unlikely to be an isolated event. In its first seventy years of existence, this part of the Mississippi River and Tributaries Project was opened a total of eight times.  Since 2008, the Bonnet Carré has been opened six times.  In 2018 and 2019, the spillway opened in consecutive years for the first time.  In 2019 the spillway for the first time opened twice in a single year, for a total of 123 days – almost twice as long as any previous opening.  This history, together with the long term trend of increasing precipitation in the upper Mississippi River Basin and high nutrient pollution loads in the river, underscore the danger to coastal Mississippi from the Bonnet Carré spillway.

6.      Federal laws require that the Corps and Mississippi River Commission consider the impacts to coastal communities and natural resources in the coastal zone resulting from their actions.  These laws also require that the Corps and Mississippi River Commission consider alternatives to help mitigate or remove those impacts where possible.

7.      The consequence of the Corps and Mississippi River Commission's failure to comply with applicable law—including without limitation their failure to perform required and sensible analyses—is not just a violation of law, it is a real and tragic missed opportunity, which has caused significant losses to Plaintiffs and residents, visitors and citizens in this District.  The talented engineers and scientists who would be involved in an impact analysis can without any

doubt identify long and short-term strategies to reduce or prevent the extraordinary natural, economic and social damage caused by the operation of the Bonnet Carré spillway as part of the Mississippi River and Tributaries Project. These include, without limitation, relatively simple, cost-efficient methods of changes in timing of flows, utilizing limited flows through other spillways, and addressing upstream sources of pollutants. The people of south Mississippi, who are asked to sacrifice so their brothers and sisters elsewhere may thrive, are owed no less.

8.      Respectfully, given the recent frequency of occurrence and gravity of harm, the undersigned governmental entities and citizens request the following:

(1)  A declaration that the Corps of Engineers and Mississippi River Commission have violated the National Environmental Policy Act and the Magnuson-Stevens Sustainable Fishery Conservation and Management Act;

(2)  An order requiring the Corps of Engineers and the Mississippi River Commission to fully comply with applicable laws, and requiring them to undertake the analysis required by those laws with all due haste, on a schedule established and supervised by this Court; and

(3)  Preliminary injunctive relief requiring the Corps to comply with all applicable laws, and to undertake a formal consultation process with Plaintiffs prior to any additional opening of the spillway without full compliance with said laws, and perform all other such actions necessary to avoid and minimize the adverse impacts of spillway operation, and that this relief be made permanent after hearing of this cause of action.

## II.  JURISDICTION AND VENUE ARE PROPER IN THIS DISTRICT BECAUSE THE DAMAGE FROM THE BONNET CARRÉ SPILLWAY OPENING OCCURRED IN THIS DISTRICT.

9.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it involves questions of federal law.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e) because a substantial part of the events giving rise to the claims occurred in this district, and the Plaintiffs reside in this district.

### III.  THE PLAINTIFFS IN THIS CASE ARE LOCAL GOVERNMENTS AND BUSINESS OWNERS WHO HAVE BEEN DIRECTLY DAMAGED BY THE OPERATION OF THE BONNET CARRÉ SPILLWAY.

11.    The City of Biloxi, Mississippi, is a municipality organized under the law of Mississippi.  It is the third largest city in Mississippi, directly borders the Mississippi Sound, and has over 44,000 residents.  Biloxi has a long heritage in the seafood industry and tourism, and these industries remain a mainstay of the City's economy and the well-being of its residents. Biloxi's proprietary interests and those of its citizens have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

12.    Harrison County Mississippi is a county organized under the law of Mississippi. It is the second most populous county in Mississippi, with over 187,000 residents.  Harrison County borders the Mississippi Sound, and like Biloxi the seafood and tourism industries are mainstays of the County's economy and the well-being of its residents. Harrison County's proprietary interests and those of its citizens have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

13.    Hancock County, Mississippi is a county organized under Section 19-1-45 of the Mississippi Code. It is geographically the Mississippi county closest to the Bonnet Carré spillway, with approximately 46,000 residents. Hancock County borders the Mississippi Sound. The seafood and tourism industries are mainstays of the County's economy and the well-being of

4

its residents. Hancock County's proprietary interests and those of its citizens have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be addressed by the relief requested in this matter.

14.    The City of D'Iberville, Mississippi, is a municipality organized under the law of Mississippi.  D'Iberville borders the body of water known as the Bay of Biloxi or Back Bay of Biloxi, which is part of an estuary that borders the Mississippi Sound and is an essential part of the ecosystem of the Mississippi Sound. The seafood and tourism industries are mainstays of the City's economy and the well-being of its residents.  D'Iberville's proprietary interests and those of its citizens have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

15.    The City of Waveland, Mississippi is a municipality organized under the law of Mississippi.  Waveland borders the Mississippi Sound, and the seafood and tourism industries are mainstays of the City's economy and the well-being of its residents. Waveland's proprietary interests and those of its citizens have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

16.    The City of Pass Christian, Mississippi is a municipality organized under the law of Mississippi. Affectionately known to generations as "the Pass," the city is essentially a peninsula in the Mississippi Sound.  The seafood and tourism industries are mainstays of the City's economy and the well-being of its residents.  Pass Christian was historically known for its oysters; indeed the original French colonists named the channel in the area *Passe aux Huîtres*.

5

Pass Christian has about 6,000 residents. Pass Christian's proprietary interests and those of its citizens have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

17.     The City of Diamondhead was chartered on February 6, 2012 and is one of Mississippi's youngest cities.  Diamondhead is located on the Jourdan River and Bay St. Louis. Diamondhead is home to many retirees and families, and the recreational and outdoor opportunities the area provides are essential to the health of the City and its economy. Diamondhead has approximately 8500 residents.  Diamondhead's proprietary interests and those of its citizens have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

18.     The Mississippi Hotel and Lodging Association is a non-profit professional association headquartered in Biloxi, Mississippi, which serves over 350 Mississippi lodging and tourism businesses.  Members of the Association include hotels, Convention and Visitors Bureaus, Chambers of Commerce, Welcome Centers and others.  The success of Association members, particularly those on the Gulf Coast, is dependent on a clean and functioning ecosystem in the Mississippi Sound.  Among the services that the Association provides are measurements of monthly occupancy rates.  These measurements, and the direct experience of Association members, show that the disruptions in natural systems, beach closures and negative publicity associated with the operation of the Mississippi River and Tributaries Project have cost members millions of dollars, and are likely to cost them millions more.  The Association's own interests and those of its members have been and will be harmed by the failures of the Corps and

6

the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

19.     Mississippi Commercial Fisheries United, Inc. is a Mississippi non-profit corporation that exists to protect the common interests of Mississippi's commercial fishing industry, promote sustainable fisheries, and advocate for commercial fishermen and consumers. The members of MSCFU include fishermen who have been directly harmed by the damage from operation of the Mississippi River and Tributaries Project, and these fishermen are likely to continue to be harmed in the future.   MSCFU's own interests and those of its members have been and will be harmed by the failures of the Corps and the Mississippi River Commission in operating the Mississippi River and Tributaries Project, and these harms will be redressed by the relief requested in this matter.

## IV.  THE DEFENDANTS ARE THE AGENCIES RESPONSIBLE FOR OPERATING THE BONNET CARRÉ SPILLWAY.

20.     Defendant U.S. Army Corps of Engineers is an agency of the United States Government and is responsible for the physical operation of the Mississippi River and Tributaries Project and the Bonnet Carré Spillway.

21.     Defendant Mississippi River Commission is an agency of the United States Government established by statute, and is responsible for decisions regarding the operation of the Mississippi River and Tributaries Project and the Bonnet Carré Spillway.

## V.  THE BONNET CARRÉ SPILLWAY IS A PART OF THE MISSISSIPPI RIVER AND TRIBUTARIES PROJECT, WHICH IS STILL UNDER CONSTRUCTION, AND IS OPERATED AS AN INTEGRAL PART OF THAT PROJECT.

22.     The Mississippi River Basin is the  world's third largest, stretching from New York to Montana, exceeded in volume only by the Amazon and Congo River basins. The Mississippi River drains over one million square miles or 41% of the contiguous United States, including all or parts of thirty-one states and two Canadian provinces.

23.     The Mississippi River is fed by major tributaries, including the Arkansas, Illinois, Missouri, Ohio, and Red rivers, each of which possesses their own set of major and minor tributaries.

24.     For thousands of years, human civilizations thrived on the banks of the "Great River," using it for trade, cultural exchange, transportation and empire building.  Its silty deposits formed some of the most fertile farm land in North America, supplying ample food for Native American cities that in their day surpassed the population of their European counterparts.

25.     But the river's gift was also its curse. Particularly in the lower Mississippi River Valley, called by some the Mississippi Delta and Coastal Plain, seasonal floods and massive rafts or logjams constrained human habitation and navigation, limiting the form and size of communities to fit the relatively narrow natural ridges formed by the river's relic and active distributaries.

26.     In the period immediately after the Louisiana Purchase, navigation and flood control on the Mississippi were viewed independently.  Management of overflowed waters on state lands was considered a matter of local or state concern, while maintaining navigation on navigable waters was considered exclusively federal.  But after a series of major floods in the

8

mid-1800's wrecked communities and froze interstate commerce, a consensus emerged that a more serious flood control system was in the national interest.

27.     As one consequence, Congress passed the Mississippi River Control Act in 1879, creating the Mississippi River Commission.[1] The Commission consists of three officers of the Corps of Engineers, one of whom would be President; one member from the U.S. Coast and Geodetic Survey; and three civilians, two of whom must be civil engineers.  As stated in the law, the Mississippi River Commission was tasked with developing and implementing a plan "to correct, permanently locate, and deepen the channel and protect the banks of the Mississippi River, improve and give safety and ease to navigation thereof, prevent destructive floods, promote and facilitate commerce, trade, and the postal service."

28.     The manner in which flooding was proposed to be controlled proved highly controversial.  Ultimately the Mississippi River Commission adopted a plan favored by the Corps that would include some dams, closing secondary channels and dredging to increase the river's speed.  This approach continued until the Great Flood of 1927.

29.     The Flood Control Act of 1928, enacted in response to the disastrous 1927 floods, resulted in the Mississippi River and Tributaries Project, the nation's first comprehensive flood control and navigation plan.  Corps designers calculated a "Mississippi River and Tributaries Project Design Flood", a flood slightly larger than the flood of 1927, and then designed levees, spillways, channel improvements and other controls to control that flood.  The recommended plan was in a document called the Jadwin Report, House Document 90 of the 70th Congress.  The Jadwin report recommended that flows in the Mississippi River at New Orleans be limited to 1,250,000 cubic feet per second.  This was considered to be the level, on the river almost 100

---

[1] 33 U.S.C. Ch.13, §641 *et seq*.

9

years ago, that would prevent the river exceeding 20 feet on the Carrollton Gauge in New Orleans, and avoid danger to the city.

30.     The 1928 Mississippi River and Tributaries Project called for the construction of new and more substantial levees, as well as "relief valves" for the Mississippi.  These floodways and spillway structures were intended to work together to allow water to be diverted from the main channel of the river, easing pressure on levees.

31.     The Birds Point-New Madrid Floodway is located in Missouri near the confluence of the Mississippi and Ohio rivers.  It is capable of diverting up to 550,000 cubic feet per second of flows from the Mississippi.

32.      The Bonnet Carré Spillway Control Structure is just upriver of the city of New Orleans and releases river water into Lake Pontchartrain and ultimately the Mississippi Sound.  It is capable of diverting up to 250,000 cubic feet per second of flows from the Mississippi.  At this volume the Bonnet Carrè would rank as the fifth largest river in the contiguous United States.

33.     The Morganza Floodway diverts river water into the Atchafalaya Basin of Louisiana.  At the time of the Flood Control Act of 1928, the Atchafalaya River was still directly connected to and received flow from the Mississippi River through a connection called "Old River," formed in 1831 when Captain Henry Shreve dug a shortcut across a point called Turnbull's Bend.  Thus, in 1928 a substantial amount of flood water in the Mississippi would simply flow down the Atchafalaya naturally. The Morganza Floodway was originally to be activated when a "relief levee" downstream of Old River failed, allowing additional flood water from the Mississippi to flow from the river.  The 1936 Flood Control Act replaced this relief levee with a spillway structure, the Morganza Spillway, which could be opened to control the amount of water to be diverted to the Atchafalaya. This spillway was originally designed so it

10

could be opened at a river stage of 49 feet, and was designed to divert up to 600,000 cubic feet per second from the Mississippi.

34.     By the 1950's, it was clear that the Mississippi was sending more and more of its flow down the Atchafalaya and the Atchafalaya would eventually capture the main flow of the river.  A second structure at the headwaters of the Atchafalaya, the Old River Control Structure, was completed in 1963 to manage the distribution of water between the Mississippi and the Atchafalaya.  This structure can also be used for emergency flood control.  In the hypothetical Project Flood the Morganza and Old River structures would be used to allow no more than 1,500,000 cubic feet per second of water from passing down the Mississippi below those structures.

35.     All of these spillways work together with the levee system and channel improvements to provide protection against the Project Flood and to prevent river flows from exceeding 1,250,000 cubic feet per second at New Orleans.

36.     Construction on the Mississippi River and Tributaries Project has not been completed and is still ongoing.  Among other things, the 1973 Mississippi River Flood demonstrated that the water carrying capacity of the river had decreased, and levees had to be raised. An Environmental Impact Statement on the Mississippi River and Tributaries Project was prepared in 1976, and a Supplemental Environmental Impact Statement was prepared in 1998. In 2018 the Corps issued a scoping notice for another Supplemental Environmental Impact statement on the project.  No draft Environmental Impact Statement has yet been issued after the 2018 notice.  No National Environmental Policy Act document has considered the effects of the operation of the Mississippi River and Tributaries Project and the Bonnet Carré Spillway on the Mississippi Gulf Coast and its resources.

37.     Operations of the Bonnet Carré spillway and the other elements of the Mississippi River and Tributaries Project are guided by documents issued by the Corps.  For the Bonnet Carré spillway, these documents include a Water Control Manual which provides information "to aid the water control decision-making process."

38.     Paragraph 8.01 of the Bonnet Carré Water Control Manual describes the Bonnet Carrè as an "essential and inseparable component of the MRT Project." The Bonnet Carrè Water Control Manual makes clear that the Old River Control Structure, the Morganza Floodway, and the Bonnet Carré Spillway will *together* be operated to minimize flood damages and prevent the discharge in the Mississippi River from exceeding 1,250,000 cubic feet per second at New Orleans."  The Corps retains discretion to use the different elements of the Mississippi River and Tributaries Project to control river flows in the vicinity of New Orleans.

39.     The 2011 Mississippi River flood was one of the largest on record.  The Birds Point-New Madrid Floodway was opened for the first time in history. The Morganza Spillway was opened for the second time in history.  In the 2011 flood the Corps of Engineers again found that the channel of the Mississippi had lost carrying capacity.  As a consequence the river threatened to overtop the Morganza spillway structure prior to the time that it reached a flow of 1,500,000 cubic feet per second.  In response to these changes, the Corps of Engineers issued an amendment in August 2014 to the instructions in the Water Control Manual for the Morganza Floodway.  This amendment provided among other things that:

> The structure shall be operated such that the stage on the river side of the structure does not exceed 57 feet NGVD29 (56.7 feet NAVD88 [2004.65]) and the Mississippi River discharge below the floodway does not exceed 1,500,000 cfs on a projected rise, based upon a 10 day forecast. The structure may also be operated to minimize flood damages in the lower river reaches, minimize stress in leveed reaches, prevent stages from exceeding the approved flowline (i.e. encroachment on freeboard requirements) and prevent the discharge in the Mississippi River from exceeding 1,250,000 cfs at New Orleans . . . . "

40.     The decision to open the Bonnet Carré Spillway or other relief valves in the Mississippi River and Tributaries Project on any given date is memorialized in decision documents signed and issued by the President of the Mississippi River Commission.  The Mississippi River Commission has the responsibility for decisions about operation of the Bonnet Carré spillway.  However, the Corps retains the day to day operational responsibility for the Bonnet Carré, and advises the Mississippi River Commission regarding the operation of the Bonnet Carré.

**VI.  THE BONNET CARRÉ SPILLWAY IS BEING OPENED MORE FREQUENTLY, AND DAMAGE TO COASTAL MISSISSIPPI IS LIKELY TO CONTINUE TO OCCUR ON A REGULAR BASIS.**

41.     In the 87 years between its completion in 1932 and the present, the Bonnet Carré spillway has been opened on 14 separate occasions.  Six of those openings have occurred in the past 11 years, and four of them have occurred in the past four years.  The Bonnet Carré Spillway Water Control Manual states that the spillway has a frequency of operation of every 7-10 years, a

BONNET CARRE SPILLWAY OPENINGS

| Year | Date Opened | Days Open | Bays Opened | (%) Opened | Ideal flow capacity |
|---|---|---|---|---|---|
| 1937 | January 28 | 48 | 285 | 81.4% | 203,571 cu ft/s |
| 1945 | March 23 | 57 | 350 | 100% | 250,000 cu ft/s |
| 1950 | February 10 | 38 | 350 | 100% | 250,000 cu ft/s |
| 1973 | April 8 | 75 | 350 | 100% | 250,000 cu ft/s |
| 1975 | April 14 | 13 | 225 | 64.3% | 160,714 cu ft/s |
| 1979 | April 17 | 45 | 350 | 100% | 250,000 cu ft/s |
| 1983 | May 20 | 35 | 350 | 100% | 250,000 cu ft/s |
| 1997 | March 17 | 31 | 298 | 85.1% | 212,857 cu ft/s |
| 2008 | April 11 | 31 | 160 | 45.7% | 114,286 cu ft/s |
| 2011 | May 9 | 42 | 330 | 94.3% | 235,714 cu ft/s |
| 2016 | January 10 | 22 | 210 | 60.0% | 203,000 cu ft/s |
| 2018 | March 8 | 22 | 168 | 48.0% | 196,000 cu ft/s |
| 2019 | February 27 | 43 | 206 | 58.9% | 213,000 cu ft/s |
| 2019 | May 10 | 79 | 168 | 48.0% | 161,000 cu ft/s |

frequency greatly exceeded in the past decade. As set out above, the 2011 Mississippi Flood was historic in volume, and caused great damage to coastal Mississippi, in particular oyster beds. The Bonnet Carré Spillway was actually operated at a volume greater than its design capacity. The 2019 openings were also longer than any historic precedent, with the spillway remaining open into the late summer.

42.     The increase in frequency and volume of Bonnet Carré openings is directly driven by increased flooding on the Mississippi River and its tributaries.  Precipitation in the upper and

middle Mississippi has increased 5-15% since 1895, and the amount of rain in the heaviest downpours has increased by an even higher percentage.  In the past few years communities along the Mississippi have experienced successive 100, 200 and 500 year floods.  This increased precipitation will continue as a consequence of warming temperatures.  As a result, absent development of mitigating strategies by the Corps and the Mississippi River Commission, the Bonnet Carré Spillway will continue to open on a basis that will cause ongoing damage to the public resources of coastal Mississippi.

43.     The operation of the Mississippi River and Tributaries Project that resulted in the opening of the Bonnet Carré Spillway in 2019 is thus not an isolated occurrence, and is highly likely to recur.  The impacts caused by the operation of the project in 2011 and 2019 have never been considered in any impact analysis, and are far different in kind and scope from any that have ever been considered in connection with the Mississippi River and Tributaries Project. The Mississippi River and Tributaries Project is not complete, and federal action on the project remains to be completed.

### VII.  THE 2019 OPENINGS OF THE BONNET CARRÉ SPILLWAY CAUSED WIDESPREAD DAMAGE TO THE NATURAL RESOURCES AND ECONOMY OF COASTAL MISSISSIPPI.

44.     The Bonnet Carré Spillway was opened from February 27, 2019 through April 11, 2019, and again from May 10, 2019 through July 27, 2019 for a total of 123 days.  This is the largest number of days of operation of the spillway since it was completed in 1932. Approximately 1.35 trillion cubic feet of Mississippi River water was discharged into the area of the Mississippi Sound.

45.     As a consequence of this massive discharge, salinities in Mississippi coastal waters plummeted. Salinities plummeted to near zero in many areas, rather than the more saline

14

water usually found in the summer months.  The influence of the Mississippi River water

released through the spillway extended from the western parts of the Mississippi Sound, to points

outside the barrier islands and to the easternmost monitoring stations in the Mississippi Sound.

46.     The complete loss of salinity killed over 90% of the oysters in the Western

Mississippi Sound.

47.     The disruption of the salinity regime also drove fish, shrimp and other marine life

from areas they would otherwise use for feeding and spawning.  The impact of this disruption is

not fully known at this point, but crab and shrimp harvests were reduced drastically.

Recreational fishing was severely disrupted. Notably, these losses directly impact the tourism

business in the Plaintiffs' jurisdictions.

48.     The massive amounts of polluted river water also affected bottom dwelling

creatures over hundreds of square miles of water bottom. The time required for these parts of the

marine ecosystem to recover is unknown.

49.     In addition to disrupting natural salinity regimes, the Mississippi River water from

the Bonnet Carré was laden with nutrient pollution from sources in the upstream states,

principally from virtually unregulated agricultural sources.  Concentration of nitrates in

Mississippi waters was far above normal.  The combination of fresh water, high nutrient

pollution loads and warm temperatures resulted in blooms of toxic blue green algae, which can

cause illness in humans and death in pets and other animals.

50.     As a direct consequence of the opening of the Bonnet Carré spillway, the waters

of the Mississippi Sound adjacent to the mainland beaches were closed to direct contact.  These

waters remained closed through September 2019, resulting in losses to the coast's tourism-

dependent businesses that are still being calculated and further resulting in lost tax revenues that

businesses in the Mississippi coastal counties, and municipalities and school districts, would otherwise have collected from businesses related to seafood and tourism.

51.     The presence of toxic algae also stigmatized Mississippi seafood products, causing economic damage and reputational losses that will take an extended amount of time to mitigate.  Other new and highly unusual impacts occurred during the opening, although their relation to the Bonnet Carrè opening is not fully understood and should be evaluated.  Crabbers reported a widespread proliferation of parasites that attacked crabs in their traps.  Residents reported foul smells from the water.  Several fishermen contracted dangerous infections from minor puncture wounds associated with their work. These types of impacts are new and significant.

52.     The economic damage from harm to fisheries and tourism is estimated to be in the hundreds of millions of dollars.  The damage to the quality of life of the plaintiffs and the citizens of the Mississippi Gulf Coast is profound.

53.     The impacts to coastal Mississippi and its communities from the operation of the Bonnet Carrè Spillway as part of the Mississippi River and Tributaries Project in 2019 were new information and significantly different from any impacts that were contemplated or considered in the past.  Further, the operations of the Mississippi River and Tributaries Project in 2019 were different in scope and kind from any past operations, and did not constitute routine operations.

**VIII.  FEDERAL LAW REQUIRES THE CORPS TO TAKE ACTIONS TO ASSESS THE IMPACTS OF OPENING THE BONNET CARRÉ SPILLWAY, AND TO CONSIDER ALTERNATIVES THAT WOULD LESSEN OR PREVENT DAMAGE TO NATURAL RESOURCES AND LOCAL COMMUNITIES.**

A.     The National Environmental Policy Act Requires an Analysis of Impacts for Federal Actions Like the Bonnet Carré Spillway.

54.     Congress enacted the National Environmental Policy Act to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. The law implements the precautionary principle of "think first, then act."

55.     To fulfill this goal, the statute and its implementing regulations require federal agencies to prepare a document called an Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

56.     "Action" is defined by regulation to "include new and continuing activities," and may include agency plans and programs. 40 C.F.R. § 1508.18. Projects that have not been completed, such as the Mississippi River and Tributaries Project, remain subject to the National Environmental Policy Act. Corps of Engineers regulations also state that actions normally requiring an Environmental Impact Statement include major changes in the operation or maintenance of completed projects. 33 C.F.R. § 230.7(c).

57.     An Environmental Impact Statement must "provide full and fair discussion of significant environmental impacts" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. The document must include a discussion of the direct, indirect, and cumulative impacts for each reasonable alternative, 40 C.F.R. § 1508.25(c), and must identify "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii).

58.     An environmental impact statement must "be supported by evidence that the agency has made the necessary environmental analyses." 40 C.F.R. § 1502.1. Agencies must

17

"identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24.

59.     The discussion of alternatives to the proposed action "is the heart of the environmental impact statement," and it must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14; *see* 42 U.S.C. § 4332(2)(C)(iii), (E). Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. The agency must consider at least three categories of alternatives: "(1) No action alternative. (2) Other reasonable courses of actions. (3) Mitigation measures (not in the proposed action)." 40 C.F.R. § 1508.25(b).

60.     Corps of Engineers regulations recognize emergency situations may require changes in National Environmental Policy Act procedures, but provide for such procedures to be carried out beforehand if practicable.

61.     In some circumstances an agency may determine that additional review is necessary to determine whether an action is a "major federal action" requiring an Environmental Impact Statement. In such circumstances an agency is required to prepare an Environmental Assessment, which provides sufficient information to determine if an Environmental Impact Statement should be prepared. 40 C.F.R. § 1508.8.

62.     A Supplemental Environmental Impact Statement is required when an Environmental Impact Statement has been prepared, but changed circumstances or additional information demonstrate that the agency action will affect the quality of the environment in a manner or to an extent not already considered. 40 C.F.R. § 1502.9.

B.    The Magnuson-Stevens Fishery Conservation and Management Act Requires
      Consideration of the Impacts on Essential Fish Habitat of Actions Like Opening the
      Bonnet Carré Spillway.

63.    Congress adopted the Magnuson-Stevens Fishery Conservation and Management

Act ("Magnuson-Stevens Act") "to conserve and manage the fishery resources found off the

coast of the United States." 16 U.S.C. § 1801(b)(1).

64.    In 1996, Congress introduced protections for "essential fish habitats" when it

reauthorized the Magnuson-Stevens Act. In fulfilling the will of Congress, eight regional fishery

management councils were created to manage fisheries and identify essential fish habitats. The

Magnuson-Stevens Act describes essential fish habitats as "those waters and substrate necessary

to fish for spawning, breeding, feeding, or growth to maturity." 16 U.S.C. § 1802(10).

65.    The Magnuson-Stevens Act also requires that federal agencies consult with the

Secretary of Commerce before taking action which affects these essential habitats. Any federal

action "that may adversely affect any essential fish habitat identified under this chapter," cannot

be taken unless the agency consults with the Secretary of Commerce. 16 U.S.C. § 1855(b)(2); 50

C.F.R. § 600.920.

66.    In turn, the Secretary of Commerce recommends to the agency "measures that can

be taken by such agency to conserve such habitat." 16 U.S.C. § 1855(b)(4)(A). The federal

agency, within thirty (30) days of receiving the Secretary's recommendation, must respond with

a description of how the agency proposes to avoid, mitigate, or offset the impact on the fish

habitat. 16 U.S.C. § 1855(b)(4)(B).

67.    In consulting with the Secretary of Commerce, the agency must provide the

National Marine Fisheries Service with a written assessment of how their actions will affect the

essential fish habitat. 50 C.F.R. § 600.920(e)(1).

68.     An agency, in its written assessment, must include (1) a description of the action, (2) an analysis of the potential adverse effects on the essential fish habitat and the managed species, and (3) any conclusions by the agency on how its action will affect the essential fish habitat. 50 C.F.R. § 600.920(e)(3).

### IX.  FIRST CAUSE OF ACTION:  THE CORPS AND THE MISSISSIPPI RIVER COMMISSION HAVE VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT
**Plaintiffs are entitled to Declaratory Judgment and Expedited Relief, Permanent Injunction and Other Relief Allowed in Law and Equity**

69.     Under the National Environmental Policy Act, the environmental impacts analysis must be carried out before the federal action is taken.

70.     At a minimum the following actions constitute major federal actions requiring preparation of an Environmental Impact Statement:

A.  The continuing construction and operation of the Mississippi River and Tributaries Project.

B.  The issuance of the Water Control Plans and other documents governing the operation of the Bonnet Carré Spillway, the Morganza Spillway and Floodway, the Old River Control Complex, and the Birds Point-New Madrid Floodway.

C.  The specific decisions by the Corps of Engineers and the Mississippi River Commission to open the Bonnet Carré Spillway for greatly extended periods of time.

71.     Counsel for the Plaintiffs have requested under the Freedom of Information Act that the Corps produce any National Environmental Policy Act analysis of the impacts of the Bonnet Carré Spillway, but the Corps has never responded.  The Plaintiffs understand that in the past the Corps has taken the position that the operation of the Bonnet Carré Spillway constitutes "routine managerial operations" which requires no compliance with the National Environmental

Policy Act.   In a November 7, 2019 response to correspondence from the Mississippi Attorney General, the Corps stated that "if authorized" the Corps would engage with state and federal agencies on an environmental impact study.  However, as set out above, no "authorization" is required or warranted for the Corps and the Mississippi River Commission to carry out their statutory obligations under the National Environmental Policy Act.

72.     On information and belief, the Corps and Mississippi River Commission have never performed the full analysis required by the National Environmental Policy Act. This failure violates the National Environmental Policy Act and constitutes an unlawful failure to act, in violation of the Administrative Procedure Act.  5 U.S.C. § 706(1).

73.     On information and belief, the Corps and the Mississippi River Commission have failed to supplement the Environmental Impact Statement on the Mississippi River and Tributaries Project to reflect the changed circumstances and additional impacts resulting from greater and more damaging Mississippi River flooding, and resulting operation of the Bonnet Carrè Spillway.

74.     These actions and failures to act on the part of the Corps and the Mississippi River Commission have harmed the Plaintiffs and left them without any adequate remedy at law.

75.     The actions of the Corps and Mississippi River Commission in operating the Mississippi River and Tributaries Project, including opening the Bonnet Carré Spillway on specific dates, and the actual opening of the spillway, take place on a schedule that forecloses review in advance by the court, and are therefore capable of repetition but evading review.

76.     Plaintiffs have suffered losses and injuries as a direct and proximate result of these failures by Defendants.

21

77.     Plaintiffs are entitled to declaratory judgment that Defendants have violated those statutes and regulations listed *supra*,  as well as expedited relief temporarily then permanently enjoining Defendants from committing said violations, and affording Plaintiffs all other relief to which they are entitled, including compensation for losses, damages, expenses, attorneys' fees and costs.

## X.  SECOND CAUSE OF ACTION:  THE CORPS AND THE MISSISSIPPI RIVER COMMISSION HAVE NEVER CONSULTED ON IMPACTS TO ESSENTIAL FISH HABITATS BEFORE OPERATING THE BONNET CARRÉ SPILLWAY.
### Plaintiffs are entitled to Declaratory Judgment and Expedited Relief, Permanent Injunction and Other Relief Allowed in Law

78.     Under the Magnuson-Steven Act, federal agencies are required to consult with the Secretary of Commerce when federal action has the potential to adversely affect any Essential Fish Habitat. *See* 16 U.S.C. § 1855(b)(2); 50 C. F. R. §600.920.

79.     The Mississippi Sound and the areas adjacent to the Mississippi coastline have been designated as Essential Fish Habitat for red drum, shrimp, forty-three (43) species of Reef Fish, various shark species and migratory pelagic species.

80.     At a minimum the following actions constitute actions requiring consultation on Essential Fish Habitat:

A.  The continuing construction and operation of the Mississippi River and Tributaries Project.

B.  The issuance of the Water Control Plans and other documents governing the operation of the Bonnet Carré Spillway, the Morganza Spillway and Floodway, the Old River Control Complex, and the Birds Point-New Madrid Floodway.

C.  The specific decisions by the Corps of Engineers and the Mississippi River Commission to open the Bonnet Carré Spillway for extended periods of time.

22

81.    On information and belief, the Corps and Mississippi River Commission completely failed to consult with the Secretary as required by the Magnuson-Stevens Act on any of these actions. *See* 16 U.S.C.A. § 1855(b)(2); 50 C. F. R. § 600.920. This constitutes an unlawful failure to act under the Administrative Procedure Act, 5 U.S.C. § 706.

82.    The Corp and Mississippi River Commission's decision to operate the spillway was taken without the Secretary's recommendation for how to mitigate impacts to these Essential Fish Habitats. The failure by the Corp and Mississippi River Commission to adhere to Congress' mandate in the Magnuson-Stevens Act has harmed the Plaintiffs and left them without an adequate remedy at law. The actions of the Corps and Mississippi River Commission in operating the Mississippi River and Tributaries Project, including opening the Bonnet Carré Spillway on specific dates, and the actual opening of the spillway, take place on a schedule that forecloses review by the court, and are therefore capable of repetition but evading review.

83.    Plaintiffs have suffered losses and injuries as a direct and proximate result of these failures by Defendants.

84.    Plaintiffs are entitled to declaratory judgment that Defendants have violated those statutes and regulations listed supra,  as well as expedited relief temporarily then permanently enjoining Defendants from committing said violations, and affording Plaintiffs all other relief to which they are entitled, including compensation for losses, damages, expenses, attorneys' fees and costs.

## XI.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court, after due proceedings had, grant the following relief:

1. Declare under 28 U.S.C. § 2201 that the Corps of Engineers and Mississippi River Commission are in violation of the National Environmental Policy Act and the Magnuson-Stevens Fishery Conservation and Management Act;

2. Order the Corps of Engineers and Mississippi River Commission to fully comply with the requirements of the National Environmental Policy Act and the Magnuson-Stevens Fishery Conservation and Management Act with all due haste, pursuant to a schedule established and supervised by this Court;

3. In the interim, grant Plaintiffs a preliminary injunction ordering the Corps to obtain the consent of Plaintiffs  and the relevant Mississippi authorities regarding potential short term actions to avoid and minimize the adverse impacts of spillway operation and, prior to taking any action to open the Bonnet Carré Spillway, to consult with the plaintiffs and provide to the plaintiffs a written summary of the actions the Corps will take to avoid and minimize the adverse impacts of opening the spillway;

4. Award the plaintiffs their attorneys' fees and costs as required by applicable rules and statutes; and

5. Award such other and further relief as is proper in the premises.

Dated:  January 29, 2020

Respectfully submitted,

| | |
|---|---|
| */s/ Robert B. Wiygul*<br>Robert B. Wiygul (MSB #7348)<br>Waltzer Wiygul & Garside LLC<br>1011 Iberville Dr.<br>Ocean Springs, MS 39564<br>Tel: (228) 872-1125<br>Fax: (228) 872-1128<br>robert@wwglaw.com<br>*Attorneys for Plaintiffs* | */s/ Peter C. Abide*<br>Peter C. Abide (MSB #1026)<br>Currie Johnson & Myers<br>925 Tommy Munro Drive, Suite H<br>Biloxi, MS 39532<br>Tel: (228) 385-1010<br>Fax:  (228) 385-1011<br>pabide@curriejohnson.com<br>*Attorneys for City of Biloxi, Mississippi* |
| */s/ Gerald H. Blessey*<br>Gerald H. Blessey (MSB #3591)<br>Gerald Blessey Law Firm<br>2577 Chatham Ct.<br>Biloxi, MS 39531<br>Tel:  (228) 806-4755<br>blesseylaw@me.com<br>*Attorney for City of Biloxi, Mississippi* | */s/ Gary M. Yarborough, Jr.*<br>Gary M. Yarborough, Jr. (MSB #102310)<br>Yarborough Law Firm, PLLC<br>P.O. Box 4168<br>Bay Saint Louis, MS 39521<br>Tel: (228) 467-5771<br>gary@yarboroughlaw.com<br>*Attorney for Hancock County, Mississippi* |
| */s/ W. F. "Dub" Hornsby*<br>Hornsby Watts PLLC<br>1025 Howard Avenue<br>Biloxi, MS 39530<br>Tel: (228) 207-2990<br>Fax: (866) 271-4393<br>wfh@hornsbywatts.com<br>*Attorney for City of D'Iberville, Mississippi* | */s/ Timothy C. Holleman*<br>Boyce Holleman & Associates<br>1720 23rd Avenue<br>Gulfport, MS 39501<br>Tel: (228) 863-3142<br>Fax: (228) 863-9829<br>tim@boyceholleman.com<br>*Attorney for Harrison County, Mississippi* |
| */s/ Derek R. Cusick*<br>Tindell, Symmes, Estes & Cusick PLLC<br>2200 25th Avenue<br>Gulfport, MS 39501<br>Tel: (228) 896-8962<br>dcusick@tseclaw.com<br>*Attorney for City of Diamondhead, Mississippi* | */s/ Malcolm F. Jones*<br>831 E. Scenic Drive<br>Pass Christian, MS 39571<br>Tel: (228) 861-9368<br>cityattorney@pass-christian.com<br>*Attorney for City of Waveland, Mississippi and City of Pass Christian* |