## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**HARRISON COUNTY, MISSISSIPPI;**
**HANCOCK COUNTY, MISSISSIPPI;**
**CITY OF BILOXI, MISSISSIPPI; CITY**
**OF D'IBERVILLE, MISSISSIPPI;**
**CITY OF WAVELAND, MISSISSIPPI;**
**MISSISSIPPI HOTEL AND LODGING**
**ASSOCIATION; MISSISSIPPI**
**COMMERCIAL FISHERIES UNITED,**
**INC.; PASS CHRISTIAN,**
**MISSISSIPPI; CITY OF**
**DIAMONDHEAD, MISSISSIPPI**                              **PLAINTIFFS**

**v.**                                    **CAUSE NO. 1:19cv986-LG-RPM**

**MISSISSIPPI RIVER COMMISSION**
**and U.S. ARMY CORPS OF**
**ENGINEERS**                                              **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
### MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION
### FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

**BEFORE THE COURT** are the [16] Motion to Dismiss for Lack of

Jurisdiction and Failure to State a Claim filed by the defendants, Mississippi River

Commission ("MRC") and U.S. Army Corps of Engineers ("the Corps"), and the [25]

Motion for Leave to File Second Amended Complaint filed by the plaintiffs,

Harrison County, Mississippi, Hancock County, Mississippi, City of Biloxi,

Mississippi, City of D'Iberville, Mississippi, City of Waveland, Mississippi,

Mississippi Hotel and Lodging Association, Mississippi Commercial Fisheries

United, Inc., Pass Christian, Mississippi, City of Diamondhead, Mississippi.  The

parties have fully briefed the Motions.  After reviewing the submissions of the

parties, the record in this matter, and the applicable law, the Court finds, as more fully explained below, that the plaintiffs' claims against the MRC should be dismissed pursuant to Rule 12(b)(6) because the MRC is not an agency capable of being sued under the Administrative Procedure Act ("APA").  In addition, the plaintiffs' NEPA claims against the Corps must be dismissed for lack of jurisdiction because, at this time, no major federal action remains to occur.  The plaintiffs' Motion for Leave to File an Amended Complaint is denied as moot.

## BACKGROUND

In 1927, the Mississippi River "swell[ed] to unprecedented levels," resulting in one of the worst natural disasters in United States history.  Encyclopedia Britannica, https://www.britannica.com/event/Mississippi-River-flood-of-1927 (last visited Sept. 2, 2021).  More than 23,000 square miles of land were submerged, hundreds of thousands of people were displaced from their homes, and hundreds of people lost their lives.  *Id.*  It took at least two months for the floodwaters to completely subside.  *Id.*

The following year, Congress enacted the Flood Control Act of 1928, which authorized the creation of the Mississippi River and Tributaries Project ("the MR&T").  33 U.S.C. § 702a.  The Corps, under the direction of the Secretary of the Army and supervision of the Chief of Engineers, is charged with designing and constructing flood control projects.  *See* 33 U.S.C. § 701b.  The basis of the MR&T was a report drafted by Major General Edgar Jadwin, who served as Chief of Engineers for the Corps.  (Pls.' Supp. Mem., Ex. 1, ECF No. 85-1).

As Secretary of War Dwight F. Davis explained while submitting Major General Jadwin's report to President Calvin Coolidge, the MR&T was "designed to take care of the maximum flood estimated by experts to be possible." (Pls.' Supp. Mem., Ex. 1, ECF No. 85-1). This maximum probable flood is now referred to as "the project design flood." Given the river's natural tendency to flood, the MR&T was designed with the intention of leading the river, rather than attempting to drive it or force it in a particular direction. (*Id.*) The MR&T is generally composed of four features: (1) levees and floodwalls, (2) channel improvement and stabilization, (3) tributary basin improvements, and (4) floodways (or spillways). *See* US Army Corps of Engineers Mississippi Valley Division Website, https://www.mvd.usace.army.mil/About/Mississippi-River-Commission-MRC/Mississippi-River-Tributaries-Project-MR-T/ (last visited Sept. 9, 2021). The floodways and spillways include the Morganza, the Bonnet Carré, the Birds-Point New Madrid, and the Atchafalaya. *Id.*

The Bonnet Carré Spillway, which is the primary subject of this litigation, was constructed near Norco, Louisiana. It was designed to divert water from the Mississippi River into Lake Pontchartrain in an effort to prevent flooding in the city of New Orleans. After entering Lake Pontchartrain, large amounts of the water diverted by the Spillway flows into the Mississippi Sound. The Spillway is controlled by a needle dam. (Pls.' Supp. Mem., Ex. 2, ECF No. 85-2). The needles are used to increase or decrease the amount of water flowing through the Spillway. The Corps completed construction of the Spillway in 1932. (Pls.' Supp. Mem., Ex. 4

at 137, ECF No. 85-4). The Corps' 30(b)(6) designee, Joey Windham, testified that precipitation levels dictate the frequency of openings of the Bonnet Carré, and precipitation levels are cyclical in nature. (Pls'. Supp. Mem., Ex. 4 at 321-22, ECF No. 85-4). The Corps opened the Spillway in January 1937 for 48 days, March 1945 for 57 days, February 1950 for 38 days, April 1973 for 75 days, April 1975 for 13 days, April 1979 for 45 days, May 1983 for 35 days, March 1997 for 31 days, April 2008 for 31 days, May 2011 for 42 days, January 2016 for 23 days, March 2018 for 23 days, February 2019 for 44 days, May 2019 for 78 days, and April 2020 for 28 days. (Defs.' Supp. Reply, Ex. C, ECF No. 86-3). Therefore, on average, the Spillway has been opened every 6 years over an 89-year period. However, 6 of the 15 openings during that 89-year period occurred in the past 10 years, and 4 of the openings occurred between 2018 and 2020.

Major General Jadwin explained that operation of the Bonnet Carré should "leave 1,250,000 second-feet to go by New Orleans and should prevent the stage at Carrollton from rising above 20 on the gauge." (Pls.' Supp. Mem., Ex. 1 at 26-27, ECF No. 85-1). He noted, that in December 1927, that "[p]ast records indicate that [the Bonnet Carré's] operation will be required about once in five years; and for a period of from one to three months during each flood." (*Id.*) In a separate report entitled "Spillways on the Lower Mississippi River," Major General Jadwin stated that "it is anticipated that the [Bonnet Carré] will be used infrequently and for comparatively short periods." (Pl.'s Supp. Mem., Ex. 3, ECF No. 85-3). Major General Jadwin's estimates concerning operation of the Bonnet Carré revolved

-4-

around his concern over the amount of silt that would be deposited in Lake
Pontchartrain.  (*See* Pls.' Supp. Mem., Ex. 1, ECF No. 85-1).  He also noted that
discolored water may enter the Mississippi Sound, but he did not expect silt
deposits to be carried that distance.  (*Id.*)  A 1932 Report to Congress prepared by
Major D.O. Elliott gave a similar estimate for operation of the Spillway based on
past records: "one to three months on an average of once in five years."  (Pl.'s Supp.
Mem., Ex. 2, ECF No. 85-2).  He further explained, "It is expected that the
maximum flow of 250,000 cubic feet per second through the floodway will provide
an ample margin of safety for New Orleans while at the same time no inconvenience
will be caused due to the raising of Lake Pontchartrain levels."  (*Id.*)

 In 1970, Congress enacted the National Environmental Policy Act ("NEPA"),
which requires all federal agencies to prepare an Environmental Impact Statement
("EIS") for every "major Federal action."  42 U.S.C. § 4332(2)(C).  The Corps
prepared an EIS related to the MR&T in 1976.  The EIS noted:

> Mississippi River waters discharged through the spillway
> suppress salinity levels in Lake Pontchartrain, Lake Borgne, and
> Mississippi Sound.  The areal extent of the influence is dependent
> upon the volume of water flowing through the structure and the
> duration of the operation.  During periods of low salinity, many
> estuarine fishes and crustaceans migrate from the Lake Pontchartrain
> system as the salinity content decreases to a level below their
> respective tolerances.  Accordingly, the number of fresh-water
> organisms increases as the lake becomes favorable for their occupation.
> Sessile species such as commercial oysters cannot migrate to more
> favorable waters and many perish.  Oyster mortality has been
> observed in Lakes Pontchartrain and Borgne and Mississippi Sound.
> However, the influx of river waters enhances oyster production on the
> oyster beds south of the area of mortality reducing high salinities and
> supplying nutrients.

> Historically, flooding of the Pontchartrain - Borgne Basin occurred each time the Mississippi River topped its natural levees. These occurrences provided sediments and nutrients to a dynamic eco-system and nourished estuarine flora and fauna.  In essence, the discharge of Mississippi River water into the Lake Pontchartrain-Borgne-Mississippi Sound system by operation of the Bonnet Carré Spillway influences short- and long-term benefits and detriments as did natural flooding many years ago.

(Defs.' Mot., Ex. B at 44, ECF No. 16-2).

The Corps also developed Water Control Manuals that govern operation of the various MR&T structures, including the Bonnet Carré.  (See Pls.' Supp. Mem., Ex. 4 at 104, ECF No. 85-4).  The Bonnet Carré Water Control Manual was drafted in December 1984 and revised in September 1999.   (Admin. R., part 20 at 54, ECF No. 48-20).

The plaintiffs, consisting of local governmental entities and private businesses operating near the Sound, have sued the Corps and the MRC.  According to the complaint, more frequent, lengthier openings of the Bonnet Carré in recent years have caused significant damages to the environment and economy of the Mississippi Gulf Coast.  The plaintiffs' claims are brought pursuant to the Administrative Procedure Act ("APA").  Plaintiffs assert that the Corps and the MRC failed to perform the full environmental impact analysis required by NEPA. In addition, the plaintiffs allege that these defendants failed to supplement the EIS for the MR&T "to reflect the changed circumstances and additional impacts resulting from the greater and more damaging Mississippi River flooding and resulting operation of the Bonnet Carré Spillway."  (Am. Compl., at 24 (¶73).) Plaintiffs further allege that the defendants violated the Magnuson-Stevens Fishery

Conservation and Management Act, 16 U.S.C. § 1855(b)(2), by failing to consult

with the Secretary of Commerce before opening the Spillway.  The plaintiffs seek:

> (1) A declaration that the Corps of Engineers and Mississippi River
> Commission have violated the National Environmental Policy Act and
> the Magnuson-Stevens Sustainable Fishery and Management Act;
>
> (2) An order requiring the Corps of Engineers and the Mississippi
> River Commission to fully comply with applicable laws, and requiring
> them to undertake analysis required by those laws with all due haste,
> on a schedule established and supervised by this Court; and
>
> (3) Preliminary injunctive relief requiring the Corps to comply with all
> applicable laws, and to undertake a formal consultation process with
> Plaintiffs prior to any additional opening of the spillway without full
> compliance with said laws, and perform all other such actions
> necessary to avoid and minimize the adverse impacts of spillway
> operation, and that this relief be made permanent after hearing of this
> cause of action.

(1st Am. Compl. at 3, ECF No. 9).  In other portions of the First Amended

Complaint, the plaintiffs request "compensation for losses, damages, expenses,

attorneys' fees, and costs."  (*Id.* at 22-23). [1]

The defendants filed the present Motion to Dismiss, requesting dismissal for

lack of jurisdiction, or in the alternative, for failure to state a claim upon which

relief can be granted.  The plaintiffs requested permission to file a second amended

complaint and to conduct jurisdictional discovery.  The Court granted the motion for

---

[1] The plaintiffs have also alleged separate claims under the Magnuson-
Stevens Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–83.

jurisdictional discovery and permitted the parties to submit supplemental briefs after the discovery was completed.[2]

## DISCUSSION

## I. THE MOTION TO DISMISS THE MRC

The defendants' Motion to Dismiss MRC is brought pursuant to Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Therefore, "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010).

The defendants argue that the MRC cannot be sued under the APA because it is not a federal agency.  "[B]y its terms, the APA applies only to federal agencies." *Friends of Lydia Ann Channel v. U. S. Army Corps of Eng'rs*, 701 F. App'x 352, 358 (5th Cir. 2017) (quoting *S. Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 331 n.5 (4th Cir. 2008)).  The APA defines the term "agency" to mean "each authority of the Government of the United States, whether or not it is within or subject to

---

[2] While considering the present action, the Court considered similar, but not identical, arguments and evidence in the companion case of *Michael D. Watson v. U.S. Army Corps of Engineers, et al.*, 1:19cv989-LG-RPM.

review by another agency." 5 U.S.C. § 701(b)(1).[3]  The Fifth Circuit has not yet had the opportunity to provide guidance on the proper application of this definition. Therefore, this Court must look to the D.C. Circuit for guidance.

In *Soucie v. David*, the D.C. Circuit determined that the APA "confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions."  448 F.2d 1067, 1073 (D.C. Cir. 1971).  The court found that the Office of Science and Technology was an "agency" under the Freedom of Information Act because it engaged in the "independent function of evaluating federal programs," including the exercise of Congress's "investigatory power."  *Id.* at 1075 & n.27.  In *Grumman Aircraft Engineering Corp. v. Renegotiation Board,* the D.C. Circuit found that "Regional Boards," which aided the federal government's Renegotiation Board in reviewing and renegotiating federal government contracts, were "agencies" under the APA's definition.  482 F.2d 710, 715 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975).  It weighed heavily with the court that the Regional Boards were "empowered to make final decisions" that were not renewable by other Government entities.  *Id.* at 715 & n.20.

In contrast, the D.C. Circuit held that Initial Review Groups created by the National Institute of Mental Health did not qualify as "agencies" because they were merely consultants who "confine[d] themselves to making recommendations." *Wash. Research Project, Inc. v. Dep't of Health, Educ., & Welfare*, 504 F.2d 238, 247-48 (D.C. Cir. 1974).  Despite its power to issue regulations to maintain safety and

---

[3] The definition contains several exceptions that are not applicable here.

order on its premises, the Smithsonian Institute also did not qualify as an "agency" under the APA definition because it does not have the power to "make binding rules of general application or determine rights and duties through adjudication[;] [i]t issues no orders and performs no regulatory functions." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 882 (D.C. Cir. 1997). While these cases can provide guidance in determining whether an entity it governed by the APA, the D.C. Circuit has cautioned that "any general definition [of "agency"] can be of only limited utility to a court confronted with one of the myriad organizational arrangements for getting the business of the government done. . . . The unavoidable fact is that each new arrangement must be examined anew and in its own context." *Wash. Research Project, Inc.*, 504 F.2d at 245-46.

Congress enacted legislation creating the MRC in 1879. 33 U.S.C. § 641. The MRC consists of seven commissioners appointed by the President of the United States. 33 U.S.C. § 642. Three members of the MRC are selected from the United States Army Corps of Engineers, one from the National Ocean Survey and three "from civil life, two of whom shall be civil engineers." *Id.* The MRC's duties include conducting surveys and developing plans to, inter alia, protect the banks of the river, improve navigation of the river, and prevent flooding. 33 U.S.C. § 647. The MRC is required to submit these reports to the Secretary of the Army, who transmits the reports to Congress. *Id.* Congress provided that flood control "shall be prosecuted by the [MRC] under the direction of the Secretary of the Army and supervision of the Chief of Engineers . . . ." 33 U.S.C. §702h. Other statutes also

indicate that MRC's efforts are overseen by the Secretary of the Army and the Chief of Engineers.  For example, 33 U.S.C. § 647 requires the MRC to perform surveys and provide plans, specifications, and cost estimates to the Secretary of the Army.  33 U.S.C. § 650 provides that funds for certain Mississippi River improvement projects "may be expended, under the direction of the Secretary of the Army, in accordance with the plans, specifications, and recommendations of the Mississippi River Commission, as approved by the Chief of Engineers . . . ."  33 U.S.C. § 650.

In the opinion of the Court, the MRC does not qualify as an "agency" under 5 U.S.C. § 701(b)(1).  The MRC does not have decision-making authority.  Instead, it merely provides recommendations for flood control to the Corps.  It does not make binding rules of general application.  Ultimately, it is the decisions of the Corps, which may be based upon recommendations by the of the MRC, that are reviewable.  As a result, the plaintiffs cannot pursue claims against the MRC via the APA and defendants' Motion to Dismiss the plaintiffs' claims against MRC is granted.

## II.  RULE 12(b)(1) MOTION TO DISMISS

### A.  THE APPROPRIATE STANDARD OF REVIEW

When considering a Rule 12(b)(1) Motion, "courts may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Joiner v. United States*, 955 F.3d 399, 403 (5th Cir. 2020).  The Fifth Circuit has identified two types of attacks on a federal court's jurisdiction — a facial attack and a factual attack.

> A "facial attack" on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.  A "factual attack," however, challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.  Moreover, a "factual attack" under Rule 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist.

*Cell Sci. Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 263 (5th Cir. 2020) (citing

*Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)) (cleaned up).

"When a defendant makes a 'factual' attack on a court's subject-matter jurisdiction,

the court is 'free to weigh the evidence and satisfy itself as to the existence of its

power to hear the case.'"  *Arena v. Graybar Elec. Co.*, 669 F.3d 214, 223 (5th Cir.

2012) (citing *Morris v. U.S. Dep't of Justice*, 540 F. Supp. 898, 900 (S.D. Tex. 1982)

*aff'd*, 696 F.2d 994 (5th Cir.1983), *cert. denied*, 460 U.S. 1093 (1983)).  Here the

Corps relies on documents outside the pleadings in its Motion to Dismiss.

Therefore, it has mounted a factual attack on this Court's jurisdiction under Rule

12(b)(1).

In *Montez v. Dep't of Navy*, 392 F.3d 147 (5th Cir. 2004), the Fifth Circuit

held that "where issues of fact are central both to subject matter jurisdiction and

the claim on the merits, . . . the trial court must assume jurisdiction and proceed to

the merits."  *Id.* at 150.  The *Montez* court also explained:

> [N]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction.  Judicial economy is best promoted when the existence of a federal right is directly reached and, where no claim is found to exist, the case is dismissed on the merits.  This refusal to treat indirect attacks on the merits as Rule 12(b)(1) motions provides, moreover, a greater level of protection to the plaintiff who in truth is

> facing a challenge to the validity of his claim: the defendant is forced to proceed under Rule 12(b)(6) . . . or Rule 56 . . . both of which place greater restrictions on the district court's discretion.

*Id.*[4]  "Jurisdiction becomes intertwined with the merits of a cause of action when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief."  *Morrison v. Amway Corp.*, 323 F.3d 920, 926 (11th Cir. 2003); *see also Clark v. Tarrant Cty. Tex.*, 798 F.2d 736, 742 (5th Cir. 1986).

In *Miccosukee Tribe of Indians of Fla. v. United States*, the Southern District of Florida held that jurisdiction is not intertwined with the merits of a NEPA claim because the court's basis for jurisdiction is the Administrative Procedure Act ("APA") and the basis for the plaintiff's substantive claim is NEPA.  650 F. Supp. 2d 1235, 1240 n.2 (S.D. Fla. 2009), *aff'd sub nom. Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289 (11th Cir. 2010).  In contrast, the court in *Franco v. U.S. Dep't of the Interior*, No. CIV S-09-1072 KJM, 2012 WL 3070269, at *8 (E.D. Cal. July 27, 2012), held that "[e]ven if the rule is clear for cases where the claim and jurisdiction fall under the same statute, it does not follow that where

---

[4] The Supreme Court recently noted:

> Ordinarily, a court cannot issue a ruling on the merits when it has no jurisdiction because to do so is, by very definition, for a court to act ultra vires.  But where, as here, pleading a claim and pleading jurisdiction entirely overlap, a ruling that the court lacks subject-matter jurisdiction may simultaneously be a judgment on the merits that triggers the judgment bar.

*Brownback v. King*, 141 S. Ct. 740, 749 (2021) (cleaned up).

jurisdiction is conferred by a separate statute, the claim and jurisdiction are not intertwined."   As a result, upon deciding that a Rule 56 Motion would be premature, the California court treated the motion to dismiss for lack of jurisdiction as a Rule 12(b)(6) Motion.  *Id.*

In the opinion of the Court, the Corps' entitlement to sovereign immunity and this Court's jurisdiction are governed by the APA, but, as explained in more detail *infra*, the language of the APA requires the Court to look to the underlying facts or basis of the plaintiffs' claim, which is NEPA and the appropriate accompanying federal regulations.  This Court's jurisdiction and the merits of the plaintiffs' NEPA claim are therefore intertwined.  The Court must assume jurisdiction over the case and decide the case on the merits pursuant to either Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 56.  *See Montez*, 392 F.3d at 150.  Indeed, the parties have already conducted thorough and detailed discovery regarding the issues presented in the Corps' Motion.  Therefore, the Court will construe the Corps' Motion as a motion for summary judgment pursuant to Fed. R. Civ. P. 56.

A motion for summary judgment may be filed by any party asserting that there is no genuine issue of material fact, and that the movant is entitled to prevail as a matter of law on any claim.  Fed. R. Civ. P. 56.  The movant bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the movant carries its burden, the burden shifts to the non-movant to show that summary

judgment should not be granted.  *Id.* at 324-25.  The non-movant may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).  Factual controversies are resolved in favor of the non-moving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

## B.  WHETHER THE CORPS IS ENTITLED TO SUMMARY JUDGMENT

### 1.  ADEQUACY OF THE 1976 EIS

The plaintiffs argue that the 1976 EIS was inadequate because it did not address the environmental impact on the Mississippi Sound.  The 1976 EIS found that operation of the Bonnet Carré would affect salinity levels in the Mississippi Sound, but the plaintiffs claim that the EIS should have gone into additional detail. The plaintiffs' claims regarding the *adequacy* of the 1976 EIS are barred by the six-year statute of limitations for challenging agency action.  *See* 28 U.S.C. § 2401(a); *see also Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309, 318 (5th Cir. 2020) (applying the six-year statute of limitations to a NEPA claim).

### 2.  SUPPLEMENTATION OF THE 1976 EIS

Congress enacted NEPA for the purpose of "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere[.]"  42 U.S.C. § 4321.  To accomplish this, NEPA requires federal agencies to include, inter alia,

> in every recommendation or report on . . . major [f]ederal actions
> significantly affecting the quality of the human environment, a

-15-

> detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action[.]

42 U.S.C. § 4332(C).  This statement is referred to as an EIS.  The plaintiffs claim that the Corps has violated NEPA by failing to prepare an EIS concerning the impact of more frequent and lengthier openings of the Bonnet Carré Spillway.

The Corps argues that there has been no waiver of sovereign immunity as to the plaintiffs' NEPA claim because the plaintiffs have not identified a legally required duty to supplement or amend the EIS at issue.  The only potentially applicable waiver of sovereign immunity in this case is the APA, which "waives sovereign immunity for actions against federal government agencies, seeking nonmonetary relief, if the agency conduct is otherwise subject to judicial review." *See Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020); *see also* 5 U.S.C. § 702.  Sovereign immunity is not waived by § 702 of the APA unless there has been "agency action," *Id.* at 321, which is defined to "include[ ] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." 5 U.S.C. § 551(13) (emphasis added).  The APA provides relief for failure to act in section 706(1), which requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).  "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 64 (2004).

The plaintiffs claim that the Corps had a duty to act pursuant to NEPA and two regulations, 33 C.F.R. § 230.6 and 40 C.F.R. § 1502.9(c).  As explained previously, NEPA requires "all agencies of the Federal Government" to prepare an EIS prior to taking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  33 C.F.R. § 230.6 provides that the following agency actions normally require an EIS: "(a) Feasibility reports for authorization and construction of major projects; (b) Proposed changes in projects which increase size substantially or add additional purposes; and (c) Proposed major changes in the operation and/or maintenance of completed projects."  However, this regulation provides that "[d]istrict commanders may consider the use of an environmental assessment on these types of actions if early studies and coordination show that a particular action is not likely to have a significant impact on the quality of the human environment."  33 C.F.R. § 230.  The other regulation cited by the plaintiffs, 640 C.F.R. § 1502.9(c), requires agencies to supplement an EIS if: "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  Pursuant to this regulation, "supplementation is necessary only if 'there remains major Federal action to occur,' as that term is used in § 4332(2)(C)."  *SUWA*, 542 U.S. at 73 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (2004)).

The plaintiffs claim that the following actions by the Corps constituted "major federal actions" requiring supplementation of the EIS under NEPA:

> A.  The continuing construction and operation of [MR&T].
> B.  The issuance of the Water Control Plans and other documents governing the operation of the Bonnet Carré Spillway, the Morganza Spillway and Floodway, the Old River Control Complex, and the Birds Point-New Madrid Floodway.
> C.  The specific decisions by the Corps of Engineers and the Mississippi River Commission to open the Bonnet Carré Spillway for greatly extended periods of time.

(Pls.' Mem., at 11-12, ECF No. 28).  In their supplemental response, the plaintiffs also argue that a supplemental EIS is required due to: (1) leaks in the Bonnet Carré that allow some water to enter Lake Pontchartrain during high water events; (2) urbanization and climate change; (3) a delay in closing the Bonnet Carré in 2019 due to unsafe conditions; and (4) the opening of the Bonnet Carré at a lower river stage than that originally contemplated.

Regarding the continuing construction and operation of the MR&T project, the plaintiffs have not identified any construction that could be considered "proposed action" requiring supplementation of the EIS.  The plaintiffs cite testimony by Mr. Windham, the Corps' 30(b)(6) designee, that some of the levees located downstream of the Bonnet Carré are "not up to design grade," but no immediate plans for upgrading the levees are evidenced in the record.  (Pls.' Supp. Mem., Ex. 4 at 306, ECF No. 85-4).  The plaintiffs further claim that the Corps should be required to supplement the EIS because the Bonnet Carré is sometimes operated to protect the deficient levees.  The Water Control Manual, which was

adopted in 1984 and amended in 1999, permits the Corps to open the Bonnet Carré for that specific reason:

> Bonnet Carré will normally be operated when flow in the Mississippi River below Morganza reaches 1,250,000 cfs [cubic feet per second] on a rising hydrograph or to preserve a desired level of freeboard on deficient levees through the New Orleans Area.  The spillway will be controlled so that the flow below Bonnet Carré in the Mississippi River does not exceed 1,250,000 cfs.

((Admin R., part 20, 7-3, ECF No. 48-20).[5]  The Corps' policy, set forth in the long-standing Water Control Manual, does not constitute "proposed action" but completed action.  *See SUWA*, 542 U.S. at 73 (explaining that "supplementation is necessary only if 'there remains major Federal action to occur.'").  The plaintiffs have failed to identify any forthcoming changes to the Manual that would require supplementation of the EIS.  The plaintiffs' claims that issuance of the Water Control Manual in 1984 and revision of the Water Control Manual in 1999 required supplementation of the EIS are also barred by the six-year statute of limitations. *See* 28 U.S.C. § 2401(a); *see also Davis Mountains Trans-Pecos Heritage Ass'n v. Fed. Aviation Admin.*, 116 F. App'x 3, 17 (5th Cir. 2004) (holding that a claim for delay in supplementing an EIS accrues when circumstances requiring supplementation first arise).

The Court must next consider whether the opening of the Spillway more frequently and for longer periods of time constitutes "proposed action" requiring

---

[5] The 1.25 million cfs flow level is derived from Major General Jadwin's 1927 Report, which formed the basis of the Flood Control Act of 1928 and the MR&T project.  (Pls.' Supp. Mem., Ex. 1 at 27, ECF No. 85-1).

supplementation.  First, the plaintiffs' reliance on Major General Jadwin's statements concerning frequency of spillway operation is not well-taken.  Major General Jadwin merely provided predictions of the frequency and length of Spillway openings based on past data (as of December 1927).  There is no indication in his report that he intended to place time limits on future openings.

Furthermore, the Corps' ongoing operation of the Spillway does not constitute "proposed action" as required by NEPA.  "When an agency, responding to changing conditions, makes a decision to operate a completed facility 'within the range originally available' to it, the action is not major."  *See Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1175 (9th Cir. 2016).  The record reveals that the Corps has merely followed the operating standards established by Major General Jadwin in 1927 and reaffirmed in the Water Control Manual in 1984 and 1999.   The increase in operation of the Bonnet Carré is merely a response to changing conditions — varying precipitation levels and other environmental changes.

The 2019 delay in closing the Bonnet Carré due to unsafe conditions was a discretionary action on the part of the Corps that cannot be considered "major."  *See Mayo v. Reynolds*, 875 F.3d 11, 20-21 (D.C. Cir. 2017) (explaining that an agency is not required to supplement an EIS whenever the agency later makes discretionary choices in implementing the project).  The plaintiffs' allegations that the Bonnet Carré leaks also do not constitute a major federal action on the part of the Corps.

As for the plaintiffs' concerns related to the Carrollton gauge,[6] Major General Jadwin stated:

> The Bonnet Carré spillway is so designed as to afford complete control of the discharge into Lake Pontchartrain.  This discharge will be begun when the flood stage at New Orleans has reached 20 on the Carrollton gauge; it will be regulated to prevent the stage rising above 20, and will be cut off as soon as the stage has fallen before that figure.

(Pls.' Supp. Mem., Ex. 1, ECF No. 85-1).  The plaintiffs argue that the Corps should be required to issue a supplemental EIS because the Bonnet Carré is now operated at flood stages below 20 feet on the Carrollton gauge.[7]  In support of this argument, the plaintiffs have provided a declaration signed by Dr. Robert Criss, an expert in the field of earth and planetary sciences.  (Declaration, ECF No. 10-6).  Dr. Criss testified that the Bonnet Carré is now operated "before even the minor flooding stage of 17 feet is attained at New Orleans."  (*Id.*)

Dr. Criss included a table in his declaration that provides the maximum river stage at New Orleans each time that the Bonnet Carré has been opened.  (*Id.*)  In 1937, for example, the maximum stage was 19.29 feet, while in 2019, the maximum stage was 17.25 feet.  (*Id.*)  The lowest river stages, however, were in 1996 at 16.96 feet, and 2008 at 16.08 feet.  (*Id.*)  In addition, the Bonnet Carré was opened just

---

[6] This gauge, which is sometimes spelled "gage" by the Corps, measures the river level in New Orleans.

[7] The United States District Court for the Eastern District of Louisiana has previously rejected this argument, holding that the reference to 20 feet at the Carrollton gauge in Major General Jadwin's report was "suggestive and not a mandate, and that the current use of c.f.s. is consonant with the spirit and goals of the [Flood Control Act]."  *Save Our Wetlands, Inc. v. Flowers*, No. CIV.A. 97-0814, 1998 WL 32761, at *2 (E.D. La. Jan. 28, 1998).

before and just after issuance of the 1976 EIS, in 1975 and 1979, even though the river stage was below 18 feet (over 2 feet below the alleged parameters set by Major General Jadwin). (*Id.*) This data does not show a recent or proposed action that deviates from the original project parameters. In addition, any arguments concerning this alleged change are barred by the six-year statute of limitations.

The Corps' actions have not deviated from those contemplated by the 1976 EIS or its Water Control Manuals. The 1.25 million cfs standard that the Corps currently uses to operate the Bonnet Carré was specified in a report by Major General Jadwin in December 1927. This Court can only order the Corps to draft a supplemental EIS if the Corps proposes a major federal action that deviates from the original project. No evidence or testimony presented to the Court supports a finding of major federal action. As a result, the Corps is entitled to summary judgment.

## III.  PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Where, as here, more than twenty-one days have passed since the defendants have filed a responsive pleading, plaintiffs are permitted to amend their complaint "only with the opposing party's written consent or the court's leave." *See* Fed. R. Civ. P. 15(a)(2). Courts are instructed to "freely give leave [to amend] when justice so requires." (*Id.*) Since Rule 15 "evinces a bias in favor of granting leave to amend," courts must permit amendments "absent a substantial reason such as undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, or

undue prejudice to the opposing party." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004) (internal quotation marks omitted).

The plaintiffs request permission to file a second amended complaint so that that they can update their factual allegations to include the most recent opening of the Spillway on April 3, 2020.  They also claimed that their proposed amendment "clarifies the interests of the Plaintiffs in relation to the 'zone of interests' of [NEPA]." (Pl.'s Mem., at 2, ECF No. 26.)  These proposed changes are in response to the defendants' argument that the plaintiffs' do not have standing to assert claims pursuant to the Act.  Finally, the plaintiffs' proposed amendments "make various editorial corrections and clarifications and adds [sic] a paragraph (paragraph 76) that was inadvertently deleted between the filing of the Complaint and the First Amended Complaint." (*Id.* at 3.)  Paragraph 76 of the proposed second amended complaint, states, "On information and belief, the Corps and Mississippi River Commission have failed to comply with the obligation to prepare an Environmental Assessment to determine if each of the actions identified above requires an Environmental Impact Statement." (Pl.'s Mot. Ex. 1, at 29, ECF No. 25-1.)[8]

---

[8] An environmental assessment is "a rough cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement . . . is necessary." *La. Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 356 (5th Cir. 2006).  This type of study is only necessary for "proposed actions," 40 C.F.R. §1501.5, and the Court has determined that the Corps has no proposed actions relevant to this litigation.

The Court finds that the plaintiffs' Motion should be denied as moot because the plaintiffs' proposed amendments would not affect the Court's determination that the plaintiffs' claims against MRC and its NEPA claims against the Corps should be dismissed.

## CONCLUSION

"Except where Congress explicitly provides for [judicial] correction of the administrative process at a higher level of generality, [courts] are permitted to intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." *Lujan*, 497 U.S. at 894.  In the present case, there is no genuine issue of material fact that no major federal action remains to occur.  Therefore, the Corps' Motion to Dismiss for Lack of Jurisdiction, which this Court was required to analyze under the standards of Fed. R. Civ. P. 56, must be granted.  The Corps' Rule 12(b)(6) Motion concerning the Mississippi River Commission must also be granted because the MRC is not an "agency" under the terms of the APA.  The plaintiffs' Magnuson-Stevens Act claim against the Corps shall remain pending.

Substantive decisions regarding the operation of the flood control spillways have been entrusted by Congress to the Corps of Engineers.  Without doubt, there have been recent, more frequent openings of the Bonnet Carré Spillway.  Fresh water intrusion causes decreased salinity levels and results in adverse consequences to the Mississippi Sound and the Mississippi Gulf Coast.  However, federal courts are courts of limited jurisdiction.  Here, as noted above, the Court

does not have authority to intervene and require the Corps to prepare a
Supplemental EIS at this time.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [16] Motion to
Dismiss for Lack of Jurisdiction and Failure to State a Claim filed by the
defendants is **GRANTED**.  All of the plaintiffs' claims against the Mississippi River
Commission, as well as the plaintiff's National Environmental Policy Act claims
against the United States Army Corps of Engineers, are **DISMISSED WITH
PREJUDICE**.  The plaintiffs' Magnuson-Stevens Act claims against the United
States Army Corp of Engineers shall remain pending. [9]

**IT IS FURTHER ORDERED AND ADJUDGED** that the [25] Motion for
Leave to File Second Amended Complaint filed by the plaintiffs is **DENIED** as
moot.

**IT IS FURTHER ORDERED AND ADJUDGED** that there is no just
reason for delay as to entry of a final judgment as to the plaintiffs' claims filed
pursuant to the National Environmental Policy Act as well as the plaintiffs' claims
against the Mississippi River Commission.  The Court will enter a separate final
judgment concerning these claims pursuant to Fed. R. Civ. P. 54(b).

---

[9] Fed. R. Civ. P. 54(b) **Judgment on Multiple Claims or Involving Multiple
Parties.** When an action presents more than one claim for relief--whether as a
claim, counterclaim, crossclaim, or third-party claim--or when multiple parties are
involved, the court may direct entry of a final judgment as to one or more, but fewer
than all, claims or parties only if the court expressly determines that there is no
just reason for delay.

**SO ORDERED AND ADJUDGED** this the 13ᵗʰ day of September, 2021.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE