IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| HARRISON COUNTY, MISSISSIPPI, et al. | PLAINTIFFS |
| v. | CAUSE NO. 1:19CV986-LG-RPM |
| U.S. ARMY CORPS OF ENGINEERS | DEFENDANT |

## MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**BEFORE THE COURT** are the [109] Motion for Summary Judgment filed by Plaintiffs[1] and the [111] Motion for Summary Judgment filed by Defendant U.S. Army Corps of Engineers ("the Corps") regarding Plaintiffs' Magnuson-Stevens Act claim. The parties have fully briefed the Motions. After reviewing the submissions of the parties, the record in this matter, and the applicable law, the Court finds that the Corps' Motion for Summary Judgment should be denied, and Plaintiffs' Motion for Summary Judgment should be granted.

## BACKGROUND

The Corps is charged with designing and constructing flood control projects for the Mississippi River. *See* 33 U.S.C. § 701b. One of these flood control projects, the Bonnet Carré Spillway (hereafter referred to as "the Spillway"), is the subject of

---

[1] Plaintiffs in this action are City of Biloxi, Mississippi, City of D'Iberville, Mississippi, City of Diamondhead, Mississippi, City of Pass Christian, Mississippi, City of Waveland, Mississippi, Hancock County, Mississippi, Harrison County, Mississippi, Mississippi Commercial Fisheries United, Inc., and Mississippi Hotel and Lodging Association.

this litigation. It was constructed upstream of New Orleans, Louisiana, in order to divert water from the Mississippi River into Lake Pontchartrain. After entering Lake Pontchartrain, the water diverted by the Spillway flows into Lake Borgne and the Mississippi Sound.

Plaintiffs, which are local governments and businesses operating near the Mississippi Sound, have sued the Corps, claiming that the more frequent, lengthier openings of the Spillway in recent years have caused significant damages to the environment and economy of the Mississippi Gulf Coast. (1st Am. Compl. at 14-19, ECF No. 9). Plaintiffs allege that the Mississippi Sound, Lake Pontchartrain, and Lake Borgne have been designated as essential fish habitats governed by the Magnuson-Stevens Fishery Conservation and Management Act (hereafter "the MSA"). *See* 16 U.S.C. § 1855(b)(2). In their First Amended Complaint, Plaintiffs assert:

> At a minimum the following actions [by the Corps] constitute actions requiring consultation [with the Secretary of Commerce] on Essential Fish Habitat[s]:
>
> A. The continuing construction and operation of the Mississippi River and Tributaries Project.
>
> B. The issuance of the Water Control Plans and other documents governing the operation of the Bonnet Carré Spillway, the Morganza Spillway and Floodway, the Old River Control Complex, and the Birds Point-New Madrid Floodway.
>
> C. The specific decisions by the Corps of Engineers ... to open the Bonnet Carré Spillway for extended periods of time.

(*Id*. at 22). Plaintiffs allege that the Corps' failure to consult with the Secretary of Commerce before committing these actions constituted an unlawful failure to act

under the Administrative Procedure Act, 5 U.S.C. § 706. The parties have filed Cross-Motions for Summary Judgment that are now ripe for the Court's consideration.

## DISCUSSION

The MSA was enacted "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1). The Act provides, "Each Federal agency shall consult with the Secretary [of Commerce] with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any essential fish habitat identified under this chapter." 16 U.S.C. § 1855(b)(2); *see also id.* § 1802(39). "Congress has designated the Secretary of Commerce as the manager of the fishery conservation and management program[,] but in practice, the Secretary delegates his authority to the [National Marine Fisheries Service], which is a sub-agency of the [National Oceanic Atmospheric Administration] within the Department of Commerce." *Nat. Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014). "The term 'essential fish habitat' means those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1802(10).

The APA requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a

discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 64 (2004).

## I. THE CORPS' MOTION FOR SUMMARY JUDGMENT

### A. ARTICLE III STANDING

The Corps first argues that Plaintiffs do not have standing to pursue a claim pursuant to the Magnuson-Stevens Act. Article III of the Constitution limits judicial power to "cases" and "controversies." U.S. Const. art. III, § 2. The doctrine of standing "implements the case-or-controversy requirement by insisting that the plaintiff prove that he has suffered a concrete and particularized injury in fact that is fairly traceable to the challenged conduct and is likely to be redressed by a favorable judicial decision." *Vote.Org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022) (internal quotation marks and alterations omitted). "Injury in fact is not confined to economic injury but may include injuries to aesthetics and well-being." *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640 (5th Cir. 1983). The causation element of standing requires that the injury be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). As for redressability, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 561.

Plaintiffs have the burden of establishing standing. *See Texas v. United States*, 50 F.4th 498, 513 (5th Cir. 2022). "This inquiry places not too heavy a

burden on a prospective plaintiff because even 'a probabilistic benefit from winning a suit is enough injury in fact to confer standing' under the Constitution." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 674 (5th Cir. 1992) (quoting *N. Shore Gas v. EPA*, 930 F.2d 1239, 1242 (7th Cir. 1991)). At the summary judgment stage, plaintiffs must set forth specific facts by affidavit or other evidence. *See id.* In a case with multiple plaintiffs, "[t]he presence of one party with standing is sufficient." *Id.*

> Organizations and associations can establish an injury-in-fact through either of two theories, appropriately called "associational standing" and "organizational standing." "Associational standing" is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose. By contrast, "organizational standing" does not depend on the standing of the organization's members. The organization can establish standing in its own name if it meets the same standing test that applies to individuals.

*OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) (footnotes omitted). Since two of the plaintiffs in this matter are associations, Plaintiffs rely on associational standing, which is evaluated using a three-part test: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs rely on declarations signed by: Ryan Bradley, Executive Director of Mississippi Commercial Fisheries United (ECF Nos. 10-4, 118-2); Roscoe Liebig, member of Mississippi Commercial Fisheries United (ECF No. 118-1); Linda Hornsby, Executive Director of the Mississippi Hotel and Lodging Association (ECF No. 10-3); A. M. Gilich, Mayor of the City of Biloxi (ECF No. 10-1); and fishery science expert Dr. Robert Leaf (ECF No. 109-1).

Bradley has submitted two declarations to the Court. In the first declaration, he states that the inshore fish habitat and wild oyster reefs were "repeatedly decimated, in large part by the Bonnet Carré Spillway openings" in 2011, 2016, and 2018. (Declaration at 3, ECF No. 10-4). These events caused him to transition his seafood business to offshore reef fishing and oyster farming. (*Id.*) He testified that "[i]t was not easy transitioning away from traditional harvesting methods that [his] family had perfected over several decades." (*Id.*) He explained that the Spillway openings caused members of Mississippi Commercial Fisheries United "to use more fuel and time to get to areas where the salinities would support shrimp." (*Id.* at 3). He participated in a study of oyster reefs as coordinator of a National Academy of Sciences grant. He also opined:

> Oysters had been in a recovery phase from damage from other spillway openings as well as other problems, with a strict allowance of 30% harvest of the mature oysters. In 2018 we were starting to see some recovery of oyster spay set on Mississippi's oyster reefs . . . . The 2019 spillway opening basically killed all of the recovering oysters and laid waste to millions of dollars in oyster restoration efforts.

(*Id.* at 5). He further states, "This is a way of life down here that is unravelling while we watch it. If we have more years of the Bonnet Carré Spillway affecting us

the way it did in 2019, we will lose more fishermen, fishing families and our culture that we can never make up." (*Id.* at 6).

In his second declaration, Bradley testifies that he was personally harmed by the 2019 Spillway opening. He fishes for red snapper, which were "pushed further out in the Gulf" by the freshwater that entered Lake Borgne, the Mississippi Sound, and the Gulf of Mexico. (Declaration at 2, ECF No. 118-2). Furthermore, he opined that his inability to harvest wild oysters on inshore reefs was directly caused, at least in part, by the 2019 opening. He also noted that "blue green algae appeared with the Mississippi River water from the Bonnet Carré Spillway." (*Id.*) He claims that his seafood business was damaged because "Mississippi authorities advised people not to eat seafood from the affected waters." (*Id.*) He concludes that "[i]f the Corps tried to find ways to cause less damage to fisheries and fishermen it would help address the damage from the Bonnet Carré Spillway." (*Id.*)

Liebig, another member of Mississippi Commercial Fisheries United, has a live bait business in the Pass Christian Harbor. He testified by Declaration:

> We have a barge in the Pass Christian Harbor, and a 50[-]foot double rig shrimp boat we use to catch bait. In 2019 when the Bonnet Carré Spillway opened the water got so fresh in the Pass Christian Harbor it would kill the bait in our tanks. Usually[,] you can run in water from the harbor. To catch bait, depending on the season, we usually only have to run 30 minutes or an hour before we put out the nets. But during that time the [S]pillway was open in 2019[,] we had to run to Martin Island to even find any shrimp at all. That boat only runs 8 knots[,] and it took four hours to get out there where we could find shrimp and four hours to get back. The fresh water pushed the shrimp out of where we would catch them when the [S]pillway wasn't open. I also saw dolphins with what we call fresh[-]water lesions, speckled trout that were unhealthy, and croakers that didn't have any slime on

> them. I also used to fish oysters but the [S]pillway openings in the past wiped a lot of those out.

(Declaration at 2-3, ECF No. 118-1). Liebig further stated that he lost so much money in 2019 due to the Spillway opening that he had to obtain a $25,000 loan from the Small Business Administration pursuant to a special program available for people damaged by the Spillway opening. (*Id.* at 3).

On behalf of the Mississippi Hotel and Lodging Association, Linda Hornsby stated, "There is no question that guests cancelling their advance reservations and/or guests who, once here, shortened their stay, created a vacuum of visitors in over 2/3 of the peak Tourism Season in 2019 as a direct result of the opening of the Bonnet Carré Spillway." (Declaration at 4, ECF No. 10-3).

Mayor Gilich explained the importance of the Mississippi Sound, its beaches, and its fisheries to Biloxi's tourism-driven economy. (Declaration at 2, ECF No. 10-1). He further testified that the Mississippi Department of Environmental Quality closed the waters adjacent to the Biloxi shoreline for the entire summer of 2019 due to algae blooms, causing beaches to be deserted. He also noted the impact on fishermen, seafood restaurants, and the hotel industry. He attributed the Spillway opening to lower sales tax revenues in July and August of 2019. Finally, he stated:

> The City of Biloxi, as a municipal corporation and political subdivision of the State of Mississippi, also owns in fee simple or holds significant other property interests in the Biloxi Small Craft Harbor and Marina, Commercial Docking Facility, Point Cadet Marina, Sherman Canaan Back Bay Fishing Docks, Popps Ferry Causeway Park, Old Biloxi/Ocean Springs Fishing Bridge, eleven public recreational fishing piers and boat launches, and numerous parcels of land bordering the waterfront. The City also holds littoral rights and other interests in

> public trust tidelands throughout the 243 miles[2] of Biloxi's shoreline. The City spends substantial amounts every year on maintenance and upkeep of these properties, which are devalued by the effects of diverted Mississippi River water.

(*Id.* at 4) (footnote added).

Dr. Leaf testified that water from the Mississippi River that was released by the Spillway caused low salinity and low dissolved oxygen water conditions, which in turn reduced "the quality and/or quantity of habitat for brown shrimp, white shrimp[,] and Red Drum in the areas affected by the releases." (Declaration at 12, ECF No. 109-1).

The Corps counters that Plaintiffs have failed to identify a concrete and particularized injury, causation, and redressability. It also notes that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." (Def.'s Sur-reply at 2, ECF No. 120 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

The Corps asserts that there is no connection between the injuries claimed and the Corps' failure to consult with the National Marine Fisheries Service. While this lawsuit concerns the Corps' inaction in failing to consult under the MSA, the Corps contends, the declarations submitted by Plaintiffs focus on the Corps' action in opening the Spillway and do not attribute their alleged injuries to the Corps' failure to consult. Thus, the Corps asserts that there is no evidence or testimony

---

[2] This figure includes not only beaches along the Mississippi Sound, but also the shores of Biloxi Bay, the Biloxi River, and the Tchoutacabouffa River. (*Id.* at 1).

supporting Plaintiffs' assertion that they are claiming a procedural injury resulting from the agency's "uninformed decision-making." The Corps further notes that the declarations "refer to numerous other factors, including the BP Oil Spill, hurricanes, blue green algae, negative media reporting, and a 'perception of tainted seafood,' as contributing to their loss of tourism and oyster fishing." (Def.'s Mem. at 9, ECF No. 116).

As for redressability, the Corps argues:

> Plaintiffs seem to be conflating the procedure of consultation with the MSA with substantive agency action (e.g., changes to how and when the agency operates the Spillway). Even if the Court were to remand this case and require the Corps to consult on the potential effects of the Bonnet Carré Spillway on EFH, Plaintiffs' alleged economic injuries from loss of tourism, loss of oyster fishing, and devaluation of property in 2019 would not be redressed. Nor would any hypothetical future loss be resolved by the Corps' consultation under the MSA.

(Def.'s Mem. at 4-5 ECF No. 116). Finally, the Corps notes that redressability is lacking here because the Administrative Procedure Act does not permit an award of monetary damages. *See* 5 U.S.C. § 702 (waiving sovereign immunity for actions "seeking relief *other than money damages*").

Plaintiffs' reply:

> Plaintiffs' declarations and Dr. Leaf's declaration clearly show that the impacts of the Bonnet Carré Spillway opening in 2019 actually damaged Essential Fish Habitat, and that this damage actually affected the concrete interests of the Plaintiffs. Mayor Gilich cites the economic and cultural damage to the City. . . . Mr. Bradley cites the actual injury to the commercial fishermen who are members of his organization, as well as the impacts to his own business. He directly states that he had to move away from traditional oyster harvesting due to the impacts of the Bonnet Carré Spillway. . . . Dr. Leaf demonstrates how adverse effects in Lake Pontchartrain and the Mississippi Sound

are directly connected to impacts on shrimp, oysters and other species
and directly caused by introduction of Mississippi River water.

(Pls.' Reply at 3, ECF No. 118).  Plaintiffs also emphasize that they allege a procedural violation; thus, the injury resulted not from the Corps' decision, but from the Corps' "uninformed decision-making." (Pls.' Mem. at 6, ECF No. 110) (quoting *S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1234 (10th Cir. 2010)).  As the Supreme Court has explained:

> A litigant to whom Congress has accorded a procedural right to protect his concrete interests —here, the right to challenge agency action unlawfully withheld, [42 U.S.C.] § 7607(b)(1)— can assert that right without meeting all the normal standards for redressability and immediacy.  When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.

*Massachusetts v. E.P.A.*, 549 U.S. 497, 517-18 (2007).  Plaintiffs therefore claim they "need only show that, in making its decision . . . , the agency created an increased risk of actual, threatened, or imminent environmental harm." (Pls.' Mem. at 6, ECF No. 110) (quoting *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002)).  They also cite the Fifth Circuit's reasoning in a case concerning the National Environmental Policy Act ("NEPA"):

> The procedural injury implicit in agency failure to prepare an [Environmental Impact Statement]—*the creation of a risk that serious environmental impacts will be overlooked*—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project [such that they can] expect [ ] to suffer whatever environmental consequences the project may have.

*Sabine River Auth.*, 951 F.2d at 674 (emphasis added).

The Court finds Plaintiffs' arguments persuasive. As explained previously, it is only necessary for one Plaintiff or one member of a Plaintiff association to establish standing. The Court finds that the declarations of Ryan Bradley, Executive Director of Plaintiff, Mississippi Commercial Fisheries United, are sufficient to satisfy the injury in fact requirement because he testified about injuries to his seafood business, specifically his inability to harvest wild oysters and the difficulties caused by the dislocation of red snapper. Liebig also demonstrated injury in fact because he testified that he lost money as a result of the Spillway opening that caused him to obtain an SBA loan. The Corps' attempted distinction between damages caused by the Spillway opening and damages caused by the failure to consult with the National Marine Fisheries Service prior to opening the Spillway is not well taken. Plaintiffs' declarations have demonstrated that the Corps created an increased risk of actual, threatened, or imminent environmental harm that directly affected the Plaintiffs when it opened the Spillway without consulting with the Fisheries Service. Consultation in the future may well require the Corps to consider alternatives that would lessen this environmental harm and additional damages to Plaintiffs. This is sufficient to establish Article III standing. *See Massachusetts*, 549 U.S. at 517-18.

### B. SOVEREIGN IMMUNITY

The Corps next argues that the Court lacks jurisdiction over Plaintiffs' MSA claim because there has been no waiver of sovereign immunity. "Absent a waiver,

sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). Therefore, the "terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).

The APA "waives sovereign immunity for actions against federal government agencies, seeking nonmonetary relief, if the agency conduct is otherwise subject to judicial review." *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020); *see also* 5 U.S.C. § 702. Sovereign immunity is not waived by § 702 of the APA unless there has been "agency action," *Id.* at 321, which is defined to "include[ ] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." 5 U.S.C. § 551(13) (emphasis added). The APA provides relief for failure to act in section 706(1), which requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 64 (2004). The Corps argues that the APA does not waive sovereign immunity here because "Plaintiffs have not identified a discrete action under the MSA that is action legally required," (Pls.' Resp. Mem. at 6, ECF No. 116) (internal quotation marks omitted). Specifically, the Corps claims, the MSA does not require the Corps to consult with the National Marine Fisheries Service before Spillway openings.

The Corps first asserts that "[n]the MSA not its implementing regulations compel the Corps to consult under the circumstances here. As an initial matter, the Sustainable Fisheries Act Amendments of 1996 cannot be applied retroactively to the Bonnet Carré Spillway, which was completed in the 1930s," (Def.'s Mem. at 15, ECF No. 112), because there is no indication that Congress intended for the MSA "to attach 'new legal consequences to events completed before [the statute's] enactment.'" (Def.'s Reply at 3, ECF No. 117) (quoting *Hernandez-Castillo v. Moore*, 346 F.3d 516, 519 (5th Cir. 2006)). The Corps also points out that "EFH consultation is not required for actions that were completed prior to the approval of EFH designations by the Secretary, e.g., issued permits. Consultation is required for renewals, reviews, or substantial revisions of actions if the renewal, review, or revision may adversely affect EFH." 50 C.F.R. § 600.920(a)(1).

Plaintiffs emphasize that the MSA requires agencies to consult before taking "any action" that "may adversely affect any essential fish habitat." *See* 16 U.S.C. § 1855(b)(2). Plaintiffs claim that "any action" is a broad phrase that encompasses the Corps' decision to open the Spillway. They rely on cases construing the Endangered Species Act for the proposition that "[t]he 'any action' consultation requirement applies when an action results from 'an exercise of agency discretion.'" (Pls.' Resp. at 6, ECF No. 113) (citing *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1024 (9th Cir. 2012)). Plaintiffs also claim that "[t]he language the Corps relies on in 50 C.F.R. § 600.920(a)(1) references actions such as permits, in which the agency does not retain the sort of discretion it has with the [S]pillway."

(Pls.' Resp. at 6, ECF No. 113).  The correct focus, the Plaintiffs contend, is not the initial construction of the Spillway, but subsequent openings of the Spillway "because the Corps retains the discretion to act to prevent impacts to Essential Fish Habitat."  (Pls.' Mem. at 15, ECF No. 110).

The Corps counters that the Plaintiffs' reliance on ESA caselaw is flawed because, as explained previously, the MSA's implementing regulations do not require consultation for completed actions unless the actions constitute "renewals, reviews or substantial revisions of actions."  *See* 50 C.F.R. § 600.920(a)(1).  Thus, the Corps notes, the MSA regulations set forth an exception to the consultation requirement, but the ESA does not.

Neither the Court nor the parties have cited or found any caselaw discussing what constitutes a "completed action" under Section 600.920(a)(1).  The Corps views the initial construction of the Spillway as the only "action" at issue under the MSA and its implementing regulations, while Plaintiffs assert that each individual opening of the Spillway should be considered a separate "action."  The regulations define "[f]ederal action" as "any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken by a state agency."  50 C.F.R. § 600.910(a).  This language is also included in the statute itself.  *See* 16 U.S.C. § 1855(b)(2).  This broad definition of "action" favors Plaintiffs' interpretation.  Furthermore, as Plaintiffs note, the only example given of a "completed action" in the regulations is the issuance of a permit, which is distinguishable from the ongoing operation of a flood-control structure.  The Court has not found any support

for refusing to treat separate Spillway openings as individual actions under the MSA and its regulations.

The next issue that must be resolved in order to determine if the Corps was required to consult before Spillway openings is whether Spillway openings "may adversely affect any essential fish habitat identified under this chapter." 16 U.S.C. § 1855(b)(2). "'Essential fish habitat' means those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1802(10). The Corps does not appear to dispute that the Mississippi Sound, Lake Pontchartrain, and Lake Borgne have been designated as essential fish habitats. As previously explained, Plaintiffs have produced expert testimony from Dr. Leaf that the Spillway openings had adverse effects on the essential fish habitat in these waters. The Corps has not provided any evidence, testimony, or argument to the contrary. Therefore, Plaintiffs have not only asserted, but demonstrated, that the Corps failed to take a discrete agency action that it is required to take. *See Norton*, 542 U.S. at 64. The APA provides a waiver of sovereign immunity, and the Corps' Motion for Summary Judgment must be denied.

## II.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs seek summary judgment as to their claim that the Corps violated the MSA by failing to consult with the National Marine Fisheries Service regarding the impact that opening the Spillway has on Essential Fish Habitats. For the reasons previously stated, the Court finds that Plaintiffs' Motion should be granted. Pursuant to 5 U.S.C. § 706(1), the Court orders the Corps to consult with the

Fisheries Service regarding the impact of Spillway openings on Essential Fish Habitats or before September 30, 2023.

## CONCLUSION

For the foregoing reasons, the Corps' Motion for Summary Judgment is denied, and Plaintiffs' Motion for Summary Judgment is granted. The Corps is ordered to consult with the National Marine Fisheries Service regarding the impacts of Spillway openings as required by the MSA. This consultation shall commence as soon as practicable and shall be completed on or before September 30, 2023. The Court will retain jurisdiction over this matter to the extent necessary to ensure compliance with this Memorandum Opinion and Order. To the extent the Court has not specifically addressed the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [111] Motion for Summary Judgment filed by Defendant U.S. Army Corps of Engineers is **DENIED**.

**IT IS FURTHER ORDERED AND ADJUDGED** that the [109] Motion for Summary Judgment filed by Plaintiffs is **GRANTED**. Pursuant to 5 U.S.C. § 706(1) and 16 U.S.C. § 1855(b)(2), the Court orders the Corps to consult with the National Marine Fisheries Service regarding the impact of Spillway openings on Essential Fish Habitats or before September 30, 2023. The Court will enter a separate judgment as required by Fed. R. Civ. P. 58(a).

**SO ORDERED AND ADJUDGED** this the 18th day of January, 2023.

*s/ Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE